IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 23, 2017 Session

## CARLOS CORNWELL v. STATE OF TENNESSEE

Appeal from the Criminal Court for Knox County
No. 101725     Steven W. Sword, Judge

_____

No. E2016-00236-CCA-R3-PC
_____

The Petitioner, Carlos Cornwell, appeals as of right from the Knox County Criminal Court's denial of his petition for post-conviction relief.  The Petitioner contends (1) that he was denied his right to a competent and impartial trial judge, "resulting in structural constitutional error," due to the presiding trial judge's out-of-court misconduct during the course of the Petitioner's trial proceedings; (2) that the trial judge failed to perform his role as the thirteenth juror; (3) that the Petitioner received ineffective assistance of counsel because trial counsel failed to inspect the Petitioner's vehicle in a timely manner and failed to properly challenge evidence that was not properly preserved by the State; and (4) that the Petitioner received ineffective assistance of trial counsel because trial counsel failed to "properly investigate, challenge, and counter" the testimony of one of the State's expert witnesses and failed to properly address that witness's having questioned trial counsel's credibility during cross-examination.  Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Stephen Ross Johnson, Knoxville, Tennessee (at hearing and on appeal); Chelsea Caitlin Moore (at hearing) and Christy Ann Smith (on appeal), Student Attorneys, University of Tennessee College of Law Innocence and Wrongful Convictions Clinic, for the appellant, Carlos Cornwell.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

### I. Procedural History

The Petitioner was indicted on one count of first degree premeditated murder for the March 2008 death of his wife, Leoned Cornwell. State v. Carlos Radale Cornwell, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *1-2 (Tenn. Crim. App. Oct. 25, 2012), perm. app. denied (Tenn. Mar. 5, 2013). Following a jury trial in May 2009, the Petitioner was convicted of the lesser-included offense of second degree murder and sentenced to thirty-five years' imprisonment. Id. at *1.

This court affirmed the Petitioner's conviction and sentence on direct appeal. Cornwell, 2012 WL 5304149, at *1. On March 5, 2013, our supreme court declined to review that decision. On June 7, 2013, the Petitioner filed a timely pro se petition for post-conviction relief. Counsel was appointed to represent the Petitioner in this matter and an amended petition and memorandum of law in support of the amended petition were subsequently filed on the Petitioner's behalf. Following a lengthy post-conviction hearing, the post-conviction court entered a written order denying the petition on January 22, 2016.

### II. Trial Facts

At approximately 4:30 a.m. on March 5, 2008, two of the Petitioner's neighbors were awakened by the sound of the Petitioner's "screaming at the victim" and "calling her profane names." Cornwell, 2012 WL 5304149, at *2. One of the neighbors heard the Petitioner say to the victim, "Stupid, [motherf----r], you know that I'll kill you." Id. The Petitioner was then seen at his workplace around 5:00 a.m. Id. However, the Petitioner left work between 5:30 and 5:45 a.m., shortly after receiving a phone call. Id. Another of the Petitioner's neighbors saw the Petitioner and the victim walking toward their car and "bickering" at approximately 6:00 a.m. Id.

Titonia Sawyer was using the ATM at an ORNL Federal Credit Union branch just before 6:30 a.m. when the Petitioner and the victim's car pulled up behind her. Cornwell, 2012 WL 5304149, at *2. Ms. Sawyer saw the victim exit the passenger side of the vehicle and look "down into the car." Id. Ms. Sawyer testified that the victim did not seem agitated and that she did not hear the Petitioner and the victim arguing. Id. When Ms. Sawyer looked back at the car a second time, the victim "had both passenger side doors open." Id. Ms. Sawyer drove away after receiving her ATM receipt and noticed that the Petitioner's vehicle had not moved, "but she could no longer see the [victim]." Id.

-2-

What happened next was not captured on the credit union's surveillance cameras, and no one witnessed it. The Petitioner was then seen walking down Magnolia Avenue "screaming hysterically for someone to call [911]" because "'someone had been hit.'" Cornwell, 2012 WL 5304149, at *3. Gail and Devery Cox stopped to assist the Petitioner. Id. They called 911 and "saw the victim on the ground behind" the Petitioner's car "[a]s soon as . . . [they] entered the parking lot" of the credit union. Id. The victim's eyes were open and she was still breathing when Mr. and Ms. Cox found her, but the victim "died before emergency personnel arrived on the scene." Id. at *3-4.

The Petitioner was "frantically running about," "hysterical," and saying, "'Oh my God, oh my God,' 'I need help,' 'What have I done?', and 'What am I going to do?'" Cornwell, 2012 WL 5304149, at *3-4. The Petitioner told Ms. Cox that "he and the victim were arguing when the victim" got out of the car and "immediately" started walking. Id. at *3. According to Ms. Cox, the Petitioner stated that "he shifted the car into reverse and began backing up without realizing that he ran over the victim." Id. The Petitioner told Ms. Cox that he got out of the car and saw that the victim was underneath it. Id. So, the Petitioner stated, "he got back into the vehicle in order to move it off of the victim's body." Id.

The Petitioner was interviewed by Detective Steve Still of the Knoxville Police Department (KPD). Cornwell, 2012 WL 5304149, at *4-5. The Petitioner told Detective Still that "he thought he and the victim might be splitting up." Id. at *5. The Petitioner explained that he and the victim went to the ATM that morning to get cash for a car payment. Id. The Petitioner then told Detective Still the following:

> [T]he victim cursed [the Petitioner], exited their vehicle, retrieved her umbrella from the back of the car, and began walking toward Magnolia [Avenue]. [The Petitioner] backed up the vehicle to see where the victim was going, then accidentally ran over her. When [the Petitioner] realized he struck the victim with the car, he pulled forward to get the car off her. [The Petitioner] stated that he did not mean to hit her and that it was not intentional.

Id.

Detective Still, who had "previously served as a fatal accident investigator," testified that what he "witnessed at the scene indicated that the victim's body was dragged in the opposite direction of what [the Petitioner] told him" and noted that the Petitioner "could offer no explanation for the blood on the bottom front of the car." Cornwell, 2012 WL 5304149, at *4-5. Detective Still also noted that there was no damage to the hood or trunk of the Petitioner's car. Id. at *4. That indicated to Detective Still that "the victim's center of gravity was below the hood or trunk line of the car." Id.

-3-

at *5. Put another way, Detective Still opined that "the victim was already on the ground when [the Petitioner] ran over her." Id.

In addition to Detective Still, KPD accident reconstructionists Officers Ron Trentham and L.B. Steele testified at trial. Cornwell, 2012 WL 5304149, at *7-9. Officer Trentham described his observations of the scene as follows:

> [Officer Trentham] noted several drag marks from the edge of the roadway leading toward the final resting spot of the victim and the automobile. He also observed the presence of red drag marks that were consistent with blood. He saw blood drops at the edge of the roadway and blood smear from the sidewalk onto the asphalt area of the parking lot. Officer Trentham found blue drag marks that were consistent with the victim's denim jacket. All of the marks he found started at the edge of the road and led up to the final point of rest of the victim's body and [the Petitioner's] car. Officer Trentham located a tan or brown scrape mark that was consistent with the victim's skin and the injury pattern the medical examiner found on the victim's lower body. He observed two small black marks that were consistent with the victim's shoes. Again, all of the lines Officer Trentham observed led from the street toward the credit union to the point where the victim's body came to rest. He was able to determine the direction of movement because the marks were darker at the initial points of impact and faded as they moved forward.

Id. at *8.

In observing the Petitioner's car, Officer Trentham opined that "the victim's body was struck from the front as the vehicle moved in a forward direction," in part, because he "determined that something had disturbed the dirt around the front license plate holder and the lower part of the front bumper." Cornwell, 2012 WL 5304149, at *8. Underneath the car, there was evidence "that something had cleaned off parts of the underside" and what appeared to be blood stains. Id. at *7. "The blood and 'brush off' were located on the front passenger side of the automobile." Id. Subsequent forensic testing confirmed the presence of the victim's blood on "the metal sheet, the front guard, and the tubing guard" underneath the car. Id. at *9.

Officer Trentham testified that the blood stains ran "the length of the vehicle on the passenger side leading to the rear passenger side tire." Cornwell, 2012 WL 5304149, at *8. In addition to blood found on the underside of the car, Officer Trentham observed "blue lines that were consistent with the victim's denim jacket" "on the frame of the car next to the rear tire." Id. Officer Trentham observed "[g]rease marks and dirt on the

-4-

victim's jacket [that] were consistent with her clothing coming into contact with the right front wheel area" of the Petitioner's car.  Id.

Based upon the foregoing, Officer Trentham opined that "the victim was lying on the ground bleeding at the curb line" when she was struck by the Petitioner's car. Cornwell, 2012 WL 5304149, at *9.  Officer Trentham further opined that "from the point where the victim was struck[] she was then pushed by the vehicle."  Id.  Officer Trentham noted that the "victim's skin was transferred to the pavement as a result of her jogging pants coming down, exposing her hip area to the concrete, and leaving marks." Id.  Additionally, the blood spatter evidence at the scene suggested that "the general direction of motion of the victim's body was . . . toward the credit union from the street." Id. at *7.

Doctor Darinka Mileusnic-Polchan performed an autopsy of the victim's body and testified at trial as an expert in forensic pathology.  Cornwell, 2012 WL 5304149, at *10. Dr. Mileusnic-Polchan opined that the victim's manner of death was homicide.  Id.  Dr. Mileusnic-Polchan's observations and opinions regarding the victim's death were described in this court's direct appeal opinion as follows:

> Dr. Mileusnic-Polchan documented sixty separate injuries.  The victim suffered several head and neck injuries, including linear marks on the chin consistent with tire marks.  An abrasion by the right eyebrow displayed directionality, indicating that the body was moving against the surface.  Dr. Mileusnic-Polchan found blood stains and hair attached to the shoulder of [the] victim's jacket, most likely caused by forced bending of the head over the shoulder.
>
> Dr. Mileusnic Polchan noted that the victim's right clavicle was broken, and the neck and spine junction was fractured.  The fracture was caused by extraordinary force that separated the head from the neck.  The tire marks on the victim's neck indicated that the vehicle's rear tire ran over it.  This injury was one of the primary causes of the victim's death.  The victim also had linear abrasions under and on her right breast.  Dr. Mileusnic-Polchan described the injury to the victim's breast area as indicating movement of the victim in a particular direction, and attributed the injury to contact with the front bumper of [the Petitioner's] vehicle. She analyzed a bruise pattern and a burn on the victim's body and matched the injuries to a hot part from underneath the car, perhaps part of the exhaust or catalytic converter.
>
> The victim's abdomen sustained a great deal of injury, including "abrasions and stretch abrasions."  Dr. Mileusnic-Polchan identified a tire

track along the victim's abdominal abrasions. She stated that the tire marks could only have been made by the front tires because the rear tires were bald and could not have left those particular indentations. Dr. Mileusnic-Polchan pointed out a large burn that was over four inches long by two inches across. The skin from that burn was retrieved from underneath the vehicle. She commented on an extensive deep bruise on the right thigh that could only be consistent with the tire crossing the victim's thigh. The victim's pelvis was completely crushed, including the sacrum.

Dr. Mileusnic-Polchan noted that the victim's back was relatively clear of injury, which indicated that she was facing the vehicle with clothing covering her back. The victim did, however, receive a road rash injury to her back and buttocks. In the sacral area, some of the victim's skin was missing. Dr. Mileusnic-Polchan explained that the pattern of the injury established the direction of movement of the victim's body.

As part of her investigation, Dr. Mileusnic-Polchan examined [the Petitioner's] vehicle at the impound lot. She compared the victim's injuries with the damage to and evidence on [the Petitioner's] vehicle. Dr. Mileusnic-Polchan found that the evidence and victim's injuries supported the conclusion that the victim was struck by the front of the vehicle.

Cornwell, 2012 WL 5304149, at *10-11.

Doctor Gregory James Davis testified at trial on the Petitioner's behalf as an expert in forensic pathology. Cornwell, 2012 WL 5304149, at *11. Dr. Davis explained, in reference to Dr. Mileusnic-Polchan's testimony, "that the term 'consistent with' merely implie[d] that physical evidence could support a particular scenario; the term itself [did] not mean that the scenario or story [was] true." Id. The remainder of Dr. Davis's testimony was described in this court's direct appeal opinion as follows:

Based on his review of the evidence, Dr. Davis could not offer an opinion as to whether [the Petitioner] intended to inflict harm on the victim, nor could he confirm that the victim's injuries were unidirectional. The injuries were consistent with being unidirectional but were not indicative or diagnostic of them being unidirectional. Dr. Davis disputed Dr. Mileusnic-Polchan's findings that that injury on the victim's face was consistent with being run over by the tire of the car. If her face had been run over by a car, he would have expected to find more fractures to the jaw and skull. Dr. Davis believed that the victim's death should have been classified as "undetermined" or "not determined." His view of the physical evidence was that the evidence was consistent with [the Petitioner's] backing over

-6-

the victim. The injuries sustained by the victim, specifically the wrist fracture and the abrasions on both hands, were consistent with her walking away from the vehicle, falling, and being struck by [the Petitioner's] vehicle.

Id.

James Alan Parham testified on the Petitioner's behalf as an expert in accident reconstruction. Cornwell, 2012 WL 5304149, at *11. "Mr. Parham testified that his examination of [the Petitioner's] car was limited because the car had been stored outdoors exposed to weather." Id. at *12. Mr. Parham explained that "the police department did not sufficiently document the vehicle in order for him to determine the presence of dirt rub on the trunk, hood, or bumpers of [the Petitioner's] vehicle." Id. Mr. Parham did not believe that "the photograph of the front license plate . . . [was] conclusive of dirt rub or interaction with a person." Id. Likewise, Mr. Parham "did not find dirt rub documented anywhere on the topside of the vehicle." Id.

"Mr. Parham generally agreed with many of Officers Trentham's and Steele's findings." Cornwell, 2012 WL 5304149, at *11. However, despite the fact that the car had not been properly preserved, Mr. Parham testified that he "did not believe that the officers' opinions that the victim was struck in one direction could be proven by the evidence." Id. at *12. Instead, Mr. Parham opined "that the physical evidence was consistent with [the Petitioner's] explanation of the incident." Id.

### III. Post-Conviction Hearing

### A. Former Judge Richard R. Baumgartner

Former Judge Richard R. Baumgartner presided over the Petitioner's trial court proceedings. During the time that the Petitioner's case was pending in the trial court, Judge Baumgartner "was taking opiate pain killers." According to the subsequent investigation, Judge Baumgartner began getting multiple prescriptions for these narcotics from multiple doctors in 2008. In 2009, Judge Baumgartner approached Deena Castleman, a former offender in the Knox County Drug Court program that Judge Baumgartner oversaw, and asked her to "procure hydrocodone for him." United States v. Baumgartner, 581 Fed. App'x. 522, 525 (6th Cir. 2014).

From that point, Judge Baumgartner regularly gave Ms. Castleman "money to procure pills for him" and even "bought her a cellphone to facilitate the transactions." Baumgartner, 581 Fed. App'x. at 525. Eventually, Judge Baumgartner and Ms. Castleman began "a sexual relationship." Id. Ms. Castleman revealed the identities of her suppliers to Judge Baumgartner and introduced him to one of the suppliers, whom

Judge Baumgartner "began dealing [with] directly." Id. Until his arrest in 2011, Judge Baumgartner also attempted to intervene on Ms. Castleman's behalf with other judges, a nonprofit housing director, and a prosecutor. Id. at 525-26.

The Petitioner's lead trial counsel testified at the post-conviction hearing that he was the elected District Public Defender for the Sixth Judicial District. Lead counsel further testified that as the District Public Defender, he regularly appeared before Judge Baumgartner. Initially, lead counsel "enjoy[ed] trying cases in front of" Judge Baumgartner and thought Judge Baumgartner "was a very good judge" who "wanted to be challenged intellectually" by novel legal issues.

However, lead counsel noticed a change in Judge Baumgartner's demeanor in 2008 and 2009. Lead counsel testified that Judge Baumgartner became "aggressive," "snarky," "disrespectful," and "snipey." According to lead counsel, Judge Baumgartner started making "unprofessional" personal comments about lawyers in his courtroom. Lead counsel believed that Judge Baumgartner's behavior was directed mostly at defense counsel and that "the [S]tate's side got the benefit of the doubt." Lead counsel candidly admitted that he "still harbor[ed] a good bit of hostility toward [Judge Baumgartner] over the way he changed and the way he treated" the defense bar.

Lead counsel noted that the Petitioner's case was tried in May 2009. Lead counsel testified that during the pretrial phase, he thought Judge Baumgartner had trouble "manag[ing] the lawsuit." Specifically, lead counsel complained that he "couldn't get [Judge Baumgartner] to schedule [and hold] hearings." Lead counsel further testified that Judge Baumgartner could not "recall from one hearing to the next . . . what [they] were there for and . . . what had happened at the last hearing." Lead counsel also stated that Judge Baumgartner's rulings before and during the trial, in his opinion, "didn't make any sense."

Lead counsel testified that Judge Baumgartner's condition appeared to be worse during the hearings on the Petitioner's motion for new trial. Specifically, lead counsel recalled that his impression from the last motion for new trial hearing was that Judge Baumgartner "was paying no attention . . . to what was going on" and was "[v]ery" confused.

However, lead counsel admitted that he could not recall anything during the proceedings in the Petitioner's case that caused him to think that Judge Baumgartner was "under the influence of something." For example, lead counsel did not recall Judge Baumgartner ever slurring his speech, laying his head down, closing his eyes, falling asleep, or appearing "to lose interest." Lead counsel also admitted that in an interview with the Knoxville News-Sentinel in February 2011, he stated that he thought the

"fallout" from Judge Baumgartner's misconduct and subsequent arrest would be "minimal."

Co-counsel testified that he had been the District Public Defender's Office's supervisor for Judge Baumgartner's courtroom and that he was in Judge Baumgartner's courtroom "every day." Initially, co-counsel thought that Judge Baumgartner was "highly analytical," "very intelligent," "fair to both sides," and "kept good control of his courtroom." Over time, however, co-counsel thought "Judge Baumgartner seemed to be less happy, less attentive, more prone to anger, [and] certainly a lot less patient." Co-counsel noted that Judge Baumgartner's irritation "was directed at . . . members of the bar, . . . his own court officer[,] and witnesses."

Other than Judge Baumgartner's general irritation, co-counsel did not recall "anything that [Judge Baumgartner] did in the courtroom that would indicate that he was under the influence during [the Petitioner's] trial." Co-counsel also could not "point to anything about Judge Baumgartner's behavior specific to this case that . . . would indicate that he wasn't paying attention." Specifically, co-counsel could not recall ever seeing Judge Baumgartner with his head down or sleeping during the proceedings.

Co-counsel did recall that at the last hearing on the Petitioner's motion for new trial, Judge Baumgartner was "particularly distracted" and "appeared not to be focused . . . at all." Co-counsel testified that this was the only day of the proceedings when he thought "[s]omething was wrong" with Judge Baumgartner. Co-counsel noted that after the hearing, Judge Baumgartner entered a short written order denying the Petitioner's motion for new trial stating that "[t]he verdict of the jury [was] specifically approved by the court."

Walter Davis testified that he was an investigator at the District Public Defender's Office and that at the time of the Petitioner's trial, he had been recently hired as a legal assistant to lead counsel. Mr. Davis worked with lead counsel on the Petitioner's case. Mr. Davis testified that he thought Judge Baumgartner "appeared like he was bored and he wasn't paying attention" during the Petitioner's trial. Mr. Davis further testified that he "noticed several times" that Judge Baumgartner would "have his head in his hand[s]," but he was unsure if Judge Baumgartner was asleep during those times. Mr. Davis also testified that Judge Baumgartner "seemed really confused" at the last motion for new trial hearing and that lead counsel and co-counsel were "concerned" about Judge Baumgartner after the hearing.

The Petitioner testified that he saw Judge Baumgartner with his eyes closed and asleep on "a few occasion[s]" during his trial. However, the Petitioner admitted that he never told lead counsel or co-counsel about these alleged incidents. The Petitioner also testified that during one of the motion for new trial hearings, he saw Judge Baumgartner

with his eyes closed and "a stupid grin on his face." The Petitioner claimed that he recognized the look on Judge Baumgartner's face from his personal experience of "get[ting] high." However, the Petitioner admitted that he did not think that Judge Baumgartner was intoxicated at the hearing. The Petitioner only came to that conclusion after reading news reports about Judge Baumgartner's misconduct. The Petitioner also recalled that Judge Baumgartner seemed "confused and shaky" at the last motion for new trial hearing.

## B. Inspection of the Petitioner's vehicle and alleged <u>Ferguson</u> violation

Lead counsel testified that his office was appointed to represent the Petitioner shortly after the Petitioner was charged. However, lead counsel testified that he waited to inspect the Petitioner's vehicle until after he had received funding for an expert in accident reconstruction. Upon inspecting the vehicle, lead counsel learned that "[i]t had been stored outside at the impound lot" and was exposed to the elements.

Lead counsel recalled that his expert, Mr. Parham, told him that "the weather and elements had affected [the car] to the point where . . . there was really nothing [they] could do to determine what the condition of the vehicle was at the time" of the incident. Contrary to the trial record and this court's opinion on direct appeal, lead counsel recalled that Mr. Parham "was unable to render an opinion" on the direction the car was traveling "based on the condition of the car at the time he inspected it."

As a result of his discovery that the Petitioner's car had been stored outside, lead counsel filed a motion based on <u>State v. Ferguson</u>, 2 S.W.3d 912 (Tenn. 1999), seeking to have the indictment against the Petitioner dismissed. Lead counsel admitted that dismissal was the only remedy he sought in his <u>Ferguson</u> motion. Lead counsel testified that the decision not to seek other remedies in his <u>Ferguson</u> motion, such as a limiting jury instruction or suppression of any evidence regarding the "dirt rub" on the front of the vehicle, was not a tactical decision.

According to lead counsel, part of the reason he only sought a dismissal of the indictment was because he was frustrated that he "was having trouble getting [the <u>Ferguson</u> motion] heard." Lead counsel explained that Judge Baumgartner unexpectedly rescheduled the hearing "a couple of different" times. Lead counsel further explained that he got "the impression that [Judge Baumgartner] had prejudged the issue" when the hearing was finally held.

However, the trial record showed that lead counsel's <u>Ferguson</u> motion was filed on March 17, 2009, and the trial court held a hearing regarding the motion on March 27, 2009. The trial court denied the motion, concluding that there was not a <u>Ferguson</u>

violation because the underside of the vehicle had been preserved and there were photographs of the alleged dirt rub.

Lead counsel raised the Ferguson issue again at a hearing the Friday before the Petitioner's trial began. Specifically, lead counsel asked the trial court "to consider the other remedies [available for a Ferguson violation], particularly [a] jury instruction."[1] However, the trial court reiterated that it denied the motion because it did not believe there had been a Ferguson violation. Lead counsel testified that he did not renew his request for a Ferguson jury instruction at the end of the Petitioner's trial.

### C. Dr. Mileusnic-Polchan's testimony

Lead counsel testified that after he received Dr. Mileusnic-Polchan's autopsy report, he retained Doctor Randall Pedigo as a consulting expert and sent Dr. Pedigo the report. Lead counsel explained that Dr. Pedigo was the former Knox County Medical Examiner, but that Dr. Pedigo had lost his medical license due to "some criminal convictions."[2] Dr. Pedigo arranged a meeting between the Petitioner's defense team and Dr. Mileusnic-Polchan at her office to discuss the autopsy report. Lead counsel, co-counsel, Mr. Davis, and Dr. Pedigo[3] were all present at the meeting with Dr. Mileusnic-Polchan.

Lead counsel testified that during the meeting, he asked Dr. Mileusnic-Polchan to explain "the injuries indicated in the autopsy" report and the correlating photographs from the autopsy. Near the end of the meeting, lead counsel asked Dr. Mileusnic-Polchan to explain a pattern of injuries on the victim's abdomen. Lead counsel recalled that Dr. Mileusnic-Polchan explained "that there was an item underneath the car[, the heat shield,] that had slats on it" that "were angled." Dr. Mileusnic-Polchan further explained that "as the car traveled over the body it was . . . like a cheese grater in that those slats rubbed against . . . the skin and caused this pattern injury."

Lead counsel recalled that as Dr. Mileusnic-Polchan was explaining this, he noticed co-counsel looking through a binder of photographs of the Petitioner's car. According to lead counsel, co-counsel then confronted Dr. Mileusnic-Polchan by stating that "the car would have had to have been backing over" the victim "in order for that cheese grater effect to have left that pattern injury on her body." Lead counsel recalled that Dr. Mileusnic-Polchan "stopped what she was saying" and there was an

---

[1] This court's opinion on direct appeal incorrectly states that lead counsel did not request any Ferguson remedies other than dismissal of the indictment. Cornwell, 2012 WL 5304149, at *14.

[2] In the 1990s, Dr. Pedigo pled guilty "to multiple counts of illegal dispensing of a controlled substance and sexual battery." Pedigo v. UNUM Life Ins. Co. of Am., 145 F.3d 804, 806 n.1 (6th Cir. 1998).

[3] Dr. Pedigo did not testify at the post-conviction hearing.

-11-

"uncomfortable pause." According to lead counsel, Dr. Mileusnic-Polchan then stated that "it would depend on which angle the slats . . . were running, whether they were running backwards or forwards," and that she would need to look at the car even though co-counsel confronted Dr. Mileusnic-Polchan with three photographs he thought showed that "those slats [ran] towards the back of the car."

Lead counsel testified that the defense team left the meeting with Dr. Mileusnic-Polchan and "celebrated" because they were all under the impression that her description of the "cheese grater effect" had "confirmed what [the Petitioner] said happened." Lead counsel admitted that Dr. Mileusnic-Polchan did not say that the Petitioner's car had backed over the victim. However, lead counsel reiterated that by "the way [Dr. Mileusnic-Polchan] was describing the cheese grater effect, there was no doubt in anyone's mind she was describing the car going backwards."

Co-counsel recalled that going into the meeting with Dr. Mileusnic-Polchan, the defense team was not sure what had caused the pattern injury to the victim's abdomen but that the "heat shield was already a suspect," and they wanted to ask Dr. Mileusnic-Polchan about the injury. According to co-counsel, Dr. Mileusnic-Polchan "related those injuries directly to" the slats on the heat shield, "indicating that as the vehicle traveled over the body, that would be the . . . type of injuries she would expect to see from that shape of an object."

Co-counsel explained that he was "a car guy" and that he was confident the slats on the heat shield "were bent toward[s] the back" of the Petitioner's car. Contrary to lead counsel's recollection, co-counsel recalled that he "was just watching" as lead counsel questioned Dr. Mileusnic-Polchan at the meeting. Co-counsel testified that he thought Dr. Mileusnic-Polchan "was saying that she believed that based on [the victim's abdominal injuries], that the vehicle was traveling backwards."

Co-counsel further recalled that he "explained to" lead counsel "what [he] thought [he] was hearing" about the direction of the slats while Dr. Mileusnic-Polchan was out of the room. According to co-counsel, lead counsel then asked Dr. Mileusnic-Polchan about the heat shield again and Dr. Mileusnic-Polchan "maintained . . . [her] earlier statement . . . that the vehicle was traveling . . . in a reverse manner." Co-counsel testified that he thought Dr. Mileusnic-Polchan started to "get a little concerned about . . . the level of [their] interest in those photographs and what those [injuries] meant." So, co-counsel

-12-

believed that Dr. Mileusnic-Polchan "reserved a final opinion on the subject until she had had an opportunity to look at that car."[4]

Mr. Davis recalled that co-counsel told Dr. Mileusnic-Polchan during the meeting that if the injuries to the victim's abdomen had been caused by a "cheese grater effect," it supported the Petitioner's version of events. Mr. Davis testified that Dr. Mileusnic-Polchan "sort of became defensive" and disagreed with co-counsel's assertion. According to Mr. Davis, co-counsel then showed Dr. Mileusnic-Polchan a picture of the heat shield and "she said she would have to go back out to the scene to look at it."

Despite having the autopsy report and having met with Dr. Mileusnic-Polchan, lead counsel claimed that he "didn't really know what" opinions she would offer at trial. Lead counsel explained that the autopsy report merely "describe[d] the injuries" and that Dr. Mileusnic-Polchan was "very careful" when interviewed "not to volunteer anything." According to lead counsel, Dr. Mileusnic-Polchan would only provide "answers to [his] specific questions" and did not provide any information about "what opinion [she was] going to offer as an expert." However, lead counsel admitted on cross-examination that he asked for a continuance to retain an expert in forensic pathology after the meeting with Dr. Mileusnic-Polchan because he had learned that she would opine that all of the victim's injuries were "unidirectional" and that her testimony would be consistent with the State's theory of the case.

Nonetheless, lead counsel filed a motion for a hearing pursuant to McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997). Lead counsel explained that he filed the motion in order to learn at the hearing what Dr. Mileusnic-Polchan would testify to at trial and to examine "whether there [was] science to support [her] opinion[s]." Lead counsel admitted that he did not request the hearing to challenge Dr. Mileusnic-Polchan's qualifications, but rather to challenge her opinions that the victim's death was a homicide and that the victim's injuries were "unidirectional."

Lead counsel testified that he did not attach a "countervailing expert opinion" to his motion because he "[d]idn't think to do it." Lead counsel claimed that the prosecutor and Judge Baumgartner kept postponing the hearing and that they "never got around to it" prior to trial. Co-counsel also testified that it was "hard to get . . . a full-blown, meaningful [McDaniel] hearing out of Judge Baumgartner" and that he felt "[u]nprepared" going into trial with respect to Dr. Mileusnic-Polchan's testimony. Instead, Judge Baumgartner agreed to hold a jury-out hearing prior to Dr. Mileusnic-Polchan's testimony.

---

[4] Co-counsel incorrectly recalled the defense team's viewing the car with Dr. Mileusnic-Polchan. It is clear from the trial court record and the post-conviction hearing that a second meeting between Dr. Mileusnic-Polchan and the defense team never occurred.

-13-

Co-counsel testified that the defense team "agonized over how to use [the] information [from their meeting with Dr. Mileusnic-Polchan] and whether it was going to hold up in trial." Co-counsel further testified that the defense team was aware of how they "might suffer if . . . [they had] misinterpreted [the meeting] or if [Dr. Mileusnic-Polchan] changed her testimony." Specifically, co-counsel worried that they had misinterpreted what Dr. Mileusnic-Polchan had told them during the meeting. Nevertheless, the defense team prepared to cross-examine her about the meeting.

During his opening statement, lead counsel raised the defense team's meeting with Dr. Mileusnic-Polchan as follows:

> And then you're going to hear from Dr. Darinka Mileusnic[-Polchan]. Dr. Darinka Mileusnic[-Polchan] is the medical examiner here in town, and she's going to tell you two things. She's going to tell you she classified this, the manner of death here is homicide, and she's going to tell you that all the injuries that [the victim] sustained were unidirectional. They were caused -- they were inflicted in one direction.

> When I went to interview Dr. Mileusnic[-Polchan] to get ready for this trial, you saw a picture of [the victim], the stomach, the open torso of [the victim], and you saw a black mark that runs up her side that almost looks like a ladder, two brown marks with connecting slats, and when I was talking to Dr. Mileusnic[-Polchan], I asked her, I said, "What would have caused that injury? What is that injury?" And, very frankly, she told me. She said, "Well, that's pretty easy. There's a heat shield underneath that car . . . . If you'll look at that heat shield real carefully," she said, "that heat shield has slats and they're angled," and she said, "you know, an analogy would be a cheese grater. You know how a cheese grater has slats, and when you drag it over the cheese, it cuts the cheese. That's what made that mark on her body. As it drug over her body, it made those slashing marks."

> [Co-counsel] was there for that interview with me, and [co-counsel] says, "But, Doctor, that cheese grater, that heat shield slants towards the back of the car," and she says, "Well, I'd have to reorient myself on that piece," and he had a picture with him, and he showed it to her, and he said, "The slants move in an angle backwards. If the car went over her forward, by the cheese grater analogy, it wouldn't leave any mark on her at all. It would go over her without leaving any mark. The car would have to go backward in order for that cheese grater effect to happen." And she said, "Well, I'll have to check my orientation on that."

-14-

So we'll hear from Dr. Mileusnic[-Polchan] this week. We'll ask her about her orientation on that cheese grater analogy, and it will be interesting to see whether Dr. Mileusnic[-Polchan] has changed her opinion about whether or not that cheese grater heat shield effect could only have occurred on her as the car was backing up toward Magnolia Avenue just precisely the way [the Petitioner] said the accident occurred.

Prior to Dr. Mileusnic-Polchan's testimony, the trial court held a jury-out McDaniel hearing at which Dr. Mileusnic-Polchan and Dr. Davis testified. Lead counsel claimed that Dr. Mileusnic-Polchan offered twenty-six opinions during the jury-out hearing that he was hearing "for the first time." Co-counsel testified that he believed they did not hear all of the opinions Dr. Mileusnic-Polchan would ultimately testify about in front of the jury during the McDaniel hearing. Lead counsel claimed that the jury was "immediately" brought back into the courtroom after the jury-out hearing.

Lead counsel further claimed that he was unable to concentrate on Dr. Mileusnic-Polchan's testimony and was hesitant to raise objections because he was overwhelmed by what he had heard during the jury-out hearing immediately before. Lead counsel also claimed that he did not have the opportunity to speak to his expert witness, Dr. Davis, before Dr. Mileusnic-Polchan's testimony to the jury. However, the trial court record contradicted lead counsel's recollections of the jury-out hearing. At the conclusion of the jury-out hearing, the trial court recessed for the day, and Dr. Mileusnic-Polchan did not testify in front of the jury until the next morning.

Lead counsel testified that he tried to impeach Dr. Mileusnic-Polchan "with . . . the conversation that [they] had in her office" because she had testified that the injuries to the victim's abdomen were "caused the opposite way that she explained it in her office." However, Mr. Davis recalled that during Dr. Mileusnic-Polchan's trial testimony, she had "stuck . . . to her version" and continued to disagree "with what [co-counsel] had pointed out" during the pretrial meeting.

During cross-examination, lead counsel brought up the defense team's pretrial meeting with Dr. Mileusnic-Polchan and the "cheese grater effect." The following exchange then occurred:

[Lead counsel]: And that did not happen, you're right. And so after our discussion and after you telling us that the car would have had to have backed over her in order to make that pattern, the cheese grater analogy, Dr. Mileusnic[-Polchan], you told us if it went with the slats, it would not leave a pattern on her skin. If it went against her, it would leave the pattern that is indicative in the picture?

-15-

[Dr. Mileusnic-Polchan]: No. Actually, what -- just what statement made was a lie. I never said that the car backed over the lady. I never ever said that this car backed over Ms. Cornwell. Never ever said --

[Lead counsel]: Dr. Mileusnic[-Polchan] --

[Dr. Mileusnic-Polchan]: Please let me finish. It was a lie. I never said that the car backed over Ms. Cornwell. What I said is that the cheese grater in one direction would leave one set of injuries. In the opposite direction would be definitely different sort of injuries because of the orientation of the slats. Because I never heard from the defense team again, I went myself to see what direction was and how sharp it was. So that's why we're discussing it today.

[Lead counsel]: Dr. Mileusnic[-Polchan], you never told us that the car backed over Leoned Cornwell. You are correct there. The cheese grater analogy you gave us was if the car passed over her in the direction of the slat, it would not leave a mark. The cheese grater analogy was that it had to go -- her body had to go against the slat to leave the pattern. You did not ever say that it went backwards. You didn't know which angle the slats went to?

[Dr. Mileusnic-Polchan]: Exactly, because I didn't know, because of the angle, I couldn't ever actually even say or -- or state that I know for a fact that one direction leave no marks whatsoever, and yet the other would leave marks. That was the whole point of conversation, the whole point of having agreement that we would look at it together. Because it never happened, I went to look at it. So having in mind that the car is - - pressed under that car, one direction would leave one set of marks. How intense that would be, I don't know until I looked at it again. The other direction would definitely cut the body.

Lead counsel testified that he felt like his "head was about ready to explode" when Dr. Mileusnic-Polchan said his statement was a lie. Lead counsel explained that he took her statements to mean that she was calling him a liar in front of the jury. Lead counsel recalled that Dr. Mileusnic-Polchan was "animated" during this exchange. Lead counsel testified that Judge Baumgartner did "nothing" during the exchange. Lead counsel admitted that he did not object to Dr. Mileusnic-Polchan's statements or request a mistrial. Lead counsel testified that his failure to object or request a mistrial was not a strategic decision. Lead counsel admitted that even after his exchange with Dr. Mileusnic-Polchan, he continued to cross-examine her for several minutes.

-16-

The Petitioner recalled that Dr. Mileusnic-Polchan "got really upset and told [lead counsel] that he was a liar" when lead counsel brought up the "cheese grater effect." The Petitioner further recalled that Dr. Mileusnic-Polchan "was real aggressive on the stand" and that lead counsel "back[ed] up" during the exchange and then "drifted off" the topic. Mr. Davis recalled that lead counsel's cross-examination of Dr. Mileusnic-Polchan "got pretty heated" and that he thought Dr. Mileusnic-Polchan "was pretty angry" when she said lead counsel's statement was a lie because "she felt that she was being accused of something."

Dr. Davis was also present in the courtroom during Dr. Mileusnic-Polchan's testimony and he testified at the post-conviction hearing that he would "never forget" the exchange because he had "never heard . . . anything like that in [a] court before or since." Co-counsel recalled that Dr. Mileusnic-Polchan was "very animated" during the exchange. Co-counsel testified that the exchange "was a very ugly moment" and that he had "never seen anything like" it. Co-counsel further testified that he thought the exchange affected the remainder of lead counsel's cross-examination, that lead counsel had a "deer in headlights" look, and that the exchange "threw [lead counsel] off track."

Lead counsel recalled that there was a recess after his cross-examination of Dr. Mileusnic-Polchan. Lead counsel testified that he felt he "needed to deal with" Dr. Mileusnic-Polchan's statements. However, lead counsel decided that he could not call Dr. Pedigo to testify because of Dr. Pedigo's criminal history. Lead counsel also decided that it would not be "fair" to call Mr. Davis to the stand because Mr. Davis "had just joined the staff" at the District Public Defender's Office. With that in mind, lead counsel "felt like [he] needed to call" co-counsel to rebut Dr. Mileusnic-Polchan's testimony about the pretrial meeting.

Lead counsel testified that during the recess, he and co-counsel met with the prosecutor and Judge Baumgartner in Judge Baumgartner's chambers to discuss the situation because he thought there might be "an [ethical] issue calling co-counsel to testify." Lead counsel recalled that when he told Judge Baumgartner that he was planning on calling co-counsel as a witness, Judge Baumgartner told him "not [to] do that." Lead counsel explained that Judge Baumgartner "said the jury would hate [him] for doing that."

Lead counsel testified that he "listened to" Judge Baumgartner's advice and then went outside to think "about what [he] should do." Lead counsel further testified that he "convinced [himself]" that he "was going to make a bad situation worse" by calling co-counsel as a witness and that he "could handle" the situation without doing so. Lead counsel admitted that he never requested a jury-out hearing to make an offer of proof of what co-counsel's testimony would have been.

Lead counsel testified that his decision not to call co-counsel as a witness or make an offer of proof was not a tactical decision. Lead counsel further believed that he had provided ineffective assistance of counsel to the Petitioner in his handling of Dr. Mileusnic-Polchan's testimony. Lead counsel also believed that his handling of Dr. Mileusnic-Polchan's testimony prejudiced the Petitioner because her testimony "was [the] critical issue in the case." Co-counsel testified that Dr. Mileusnic-Polchan "was viewed by the defense as being possibly the most powerful witness." However, co-counsel admitted that even if Dr. Mileusnic-Polchan had been discredited, there was other "corroborating evidence" and that the State's other expert witnesses also testified that the victim was "hit with the front of the [Petitioner's] car and . . . [run] over."

Co-counsel recalled that he had "a rather extensive conversation" with lead counsel about how to respond to Dr. Mileusnic-Polchan's testimony during the recess. Due to the ethical concerns of having one of the Petitioner's attorneys become a witness at trial, lead counsel and co-counsel "wanted to get . . . Judge Baumgartner involved." Co-counsel explained that "[i]t was a mind-blowing judgment call that [they] were being required to make under circumstances [when] [they] were still stunned." Co-counsel further explained that they "were looking for some guidance from the court" and that they "wanted someone to tell [them] 'yes' or 'no.'"

Co-counsel testified that he "was kind of leaning toward" testifying because they "didn't have any other way to refute" Dr. Mileusnic-Polchan's testimony. However, co-counsel "didn't trust [his] opinion at that point" and "was second-guessing [himself] through the whole process" because he was so stunned by what had occurred. Co-counsel recalled that Judge Baumgartner "was clearly leaning the other way." Judge Baumgartner told them that they "shouldn't do that" because it would "be confusing" and "possibly upsetting" to the jury. Judge Baumgartner told them that he thought that it would not "work out well for [them]" and that "it could make [them] look" even worse.

Dr. Davis testified at the post-conviction hearing on the Petitioner's behalf. Dr. Davis explained that he had been "bothered" by this case since the trial in 2009 because he believed that Dr. Mileusnic-Polchan "went beyond the bounds not only of her expertise, but of forensic pathology in general in offering opinions that did not have a basis in sound forensic pathology practice." Dr. Davis further explained that Dr. Mileusnic-Polchan "came across to [him] in her testimony as an advocate for the prosecution" rather than an impartial expert.

Specifically, Dr. Davis took issue with Dr. Mileusnic-Polchan's testimony that the victim's head had been run over by one of the car's tires, her "opinion on the direction of travel of the vehicle," her "offering of an opinion of intent," and her testimony that the victim "definitively . . . was not under the influence of marijuana" when the victim was killed without any discussion of "the hangover effects of marijuana." However, Dr.

-18-

Davis admitted that he testified at trial about his disagreement with Dr. Mileusnic-Polchan's opinions regarding the tire running over the victim's head, the direction the car was traveling, and the Petitioner's intent to harm the victim. Dr. Davis also admitted that he testified about the fact that a "marijuana metabolite" was found in the victim's blood sample, but he did not testify "about the residual effects of marijuana."

Dr. Davis testified that there were "portions of [Dr. Mileusnic-Polchan's] opinion[s]" that he heard for the first time during her trial testimony. Dr. Davis further testified that he was not able to assist lead counsel in preparing to cross-examine Dr. Mileusnic-Polchan because he "didn't hear the full scope of [Dr. Mileusnic-Polchan's] opinion until she was testifying at trial."

## IV. Post-Conviction Court's Order

The post-conviction court found that "[t]hroughout the time the Petitioner's case was pending" in the trial court, Judge Baumgartner "was taking opiate pain killers." However, the post-conviction court did "not find evidence in the [trial] record that . . . [Judge Baumgartner's] use of the . . . [pain killers] affected . . . [his] ability to perform his function as a competent, neutral, and detached magistrate." The post-conviction court did not accredit the Petitioner's testimony that he saw Judge Baumgartner fall asleep during the trial. The post-conviction court further found as follows:

> [Co-counsel] testified at the post-conviction hearing that he could not remember any head nodding by the trial judge during the Petitioner's trial nor any other point that would indicate that the trial judge was impaired. In addition, the record [did] not reflect any instances where the judge had to be awakened, or have questions repeated for . . . [his] benefit. None of the attorneys who were involved in the case testified that the judge was ever asleep. Nor [did] the record reflect that the trial judge was confused or unable to function at any point.

The post-conviction court did not find that Judge Baumgartner's statement, "I want you to help me out here as I go through this," and his inability to recall what he had previously done at two of the three hearings on the Petitioner's motion for new trial to be evidence that Judge Baumgartner was confused or intoxicated during those hearings. Instead, the post-conviction court found that it was "not unreasonable for . . . [Judge Baumgartner] to simply not recall what happened during the previous hearing" due to the fact that several months had passed between two of the hearings and the complex nature of the Petitioner's motion. The post-conviction court also found that "[o]nce having his memory refreshed, [Judge Baumgartner] demonstrated recall of the previous hearings and a complete understanding of the issues."

-19-

The post-conviction court concluded that "the Petitioner [had] failed to establish the existence of structural error in his [trial] proceedings due to the [out-of-court] behavior of" Judge Baumgartner. The post-conviction court rejected the Petitioner's argument that Judge Baumgartner's out-of-court misconduct caused him to be biased in favor of the State in an attempt to curry favor with prosecutors and deflect suspicion. The post-conviction court found that this argument was "not supported by the record" because Judge Baumgartner was investigated by the Tennessee Bureau of Investigation and a special prosecutor. The post-conviction court also rejected the Petitioner's argument that Judge Baumgartner "was impaired during court appearances." Instead, the post-conviction court found that the trial recorded showed Judge Baumgartner "to be coherent, engaged, and thoughtful" during the Petitioner's proceedings.

With respect to the Petitioner's argument that Judge Baumgartner failed to perform his duty as the thirteenth juror, the post-conviction court found that Judge Baumgartner "never explicitly stated that he was exercising his role as the thirteenth juror in the Petitioner's case." However, Judge Baumgartner stated during the motion for new trial hearing that he thought "there was sufficient evidence to support [a second degree murder conviction] by the jury beyond a reasonable doubt." The post-conviction court concluded that "by [that] statement the trial court effectuated [its] duty of serving as the thirteenth juror."

With respect to the inspection of the Petitioner's car and subsequent Ferguson motion, the post-conviction court concluded that lead counsel was not deficient. The post-conviction court found that lead counsel requested other Ferguson remedies in addition to dismissal of the indictment. The post-conviction court concluded that "[t]he reason no other remedies were given was not because [lead counsel] failed to effectively advocate for his client," but because Judge Baumgartner "found that no Ferguson violation had occurred." The post-conviction court also found that lead counsel had "spent a considerable amount of effort and [pretrial] work trying to address the issue in any manner he could to assist the Petitioner."

With respect to Dr. Mileusnic-Polchan's trial testimony, the post-conviction court found that lead counsel "was well prepared for . . . [her] potential testimony" and that "[t]he entire defense team took steps to prepare for her trial testimony." The post-conviction court noted that lead counsel hired Dr. Davis to rebut Dr. Mileusnic-Polchan's opinions and "made arguments to counter her opinions." The post-conviction court concluded that lead counsel attacked Dr. Mileusnic-Polchan's opinions "vigorously during the trial testimony and in closing arguments."

Regarding the cross-examination of Dr. Mileusnic-Polchan, the post-conviction court found that "[t]he defense team engaged in lengthy deliberations" and "took ample time to consider whether to call" a witness to rebut Dr. Mileusnic-Polchan's testimony

about the pretrial meeting. The post-conviction court concluded that "[t]actical reasons for not calling each [potential witness] [had been] elicited during the post-conviction hearing."

The post-conviction court also found that, despite Dr. Mileusnic-Polchan's having called one of lead counsel's statements a lie, lead counsel's cross-examination "was effective in demonstrating to the jury" that Dr. Mileusnic-Polchan was not confident in the direction the car was traveling when confronted with the heat shield and "supported the [defense] theory . . . that the authorities jumped to conclusions in this case." The post-conviction court concluded that Dr. Mileusnic-Polchan's statement did not damage lead counsel's credibility and that "[t]here was no basis for a mistrial" or "need for any kind of limiting instruction."

## ANALYSIS

### I. Post-Conviction Standard of Review

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

### II. Structural Error

The Petitioner contends that "he was deprived of a competent and impartial judge, resulting in a structural constitutional error," due to Judge Baumgartner's out-of-court misconduct during the course of the Petitioner's trial proceedings. The Petitioner argues that our supreme court's unpublished order in State v. Letalvis Cobbins, LeMaricus Davidson, and George Thomas, No. E2012-00448-SC-R10-DD, slip opinion at 3 (Tenn. May 24, 2012), holding that a trial judge's out-of-court misconduct does not constitute structural error "when there is no showing or indication in the record that the trial judge's misconduct affected the trial proceedings" is not binding authority. The Petitioner further argues that Judge Baumgartner's illegal misconduct affected the trial proceedings

because Judge Baumgartner had "a motivation to be biased in favor of the prosecution in order to prevent suspicion or investigation into . . . [his] misconduct." The Petitioner also argues that Judge Baumgartner was not competent to preside over the trial proceedings because it was likely that he was intoxicated due to his use of narcotics. The State responds that our supreme court's order in Cobbins is controlling on this issue. The State further responds that the Petitioner failed to establish that Judge Baumgartner's out-of-court misconduct affected the trial proceedings.

Some errors "compromise the integrity of the judicial process itself" by "involv[ing] defects in the trial mechanism." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). These errors are known as structural constitutional errors and they "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no [such] criminal punishment may be regarded as fundamentally fair.'" Id. (alterations in original) (quoting Momon v. State, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting Neder v. United States, 527 U.S. 1, 8-9 (1999))). Examples of structural constitutional errors include a biased trial judge, racial discrimination in the selection of a grand jury, the complete denial of counsel, the denial of a public trial, a defective reasonable-doubt instruction, and the denial of self-representation at trial. See Washington v. Recuenco, 548 U.S. 212, 218 n.2 (2006). These errors "are not amenable to harmless error review, and therefore, they require automatic reversal when they occur." Rodriguez, 254 S.W.3d at 371.

Our supreme court's order in Cobbins dealt with three cases presided over by Judge Baumgartner that were pending at approximately the same time as the Petitioner's trial proceedings. No. E2012-00448-SC-R10-DD, slip op. at 1. In the Cobbins order, our supreme court stated that it was "aware of no authority holding that a trial judge's misconduct outside the courtroom constitutes structural error when there is no showing or indication in the record that the trial judge's misconduct affected the trial proceedings." Id. at 3. While noting that Judge Baumgartner's actions were "a clear and palpable violation" of the canons of judicial conduct, the supreme court, "in the absence of controlling authority otherwise," declined "to hold that a trial judge's out-of-court misconduct, by itself, constitutes structural error unless there is proof that the misconduct affected the trial proceedings." Id. at 4.

The Petitioner argues that the Cobbins order should not be viewed as "controlling authority [for] subsequent cases" because the order was unpublished and "limited to the facts of those cases for which it was issued." The State responds that the Cobbins order is controlling authority because it has been "repeatedly cited to . . . as binding authority" by this court. Regardless of whether the Cobbins order is controlling or persuasive authority, this court has adopted the Cobbins order's holding on structural constitutional error in a published opinion. See State v. Leath, 461 S.W.3d 73, 116 (Tenn. Crim. App.

2013). A published opinion of this court "shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction." Tenn. Sup. Ct. R. 4(G)(2).

Nor do we believe that our previous reliance on the Cobbins order was misplaced. "The right to a fair trial before an impartial judge is a fundamental constitutional right." State v. Benson, 973 S.W.2d 202, 205 (Tenn. 1998) (emphases added). However, "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Rather, these questions are "answered by common law, statute, or the professional standards of the bench and bar." Id. The floor established by the Due Process Clause simply "requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Id. at 904-05 (emphasis added). A trial judge's misconduct amounts to a structural constitutional error when the misconduct affects the judge's impartiality. Put another way, a trial judge's misconduct constitutes a structural error when that "conduct pierces the veil of judicial impartiality." People v. Stevens, 869 N.W.2d 233, 242 (Mich. 2015).

For example, in Benson our supreme court held that "bribery solicitation [by a trial judge], if proven, would constitute the denial of [a] petitioner's fundamental constitutional right to a fair trial before an impartial judge" and that the likelihood of bias was "even stronger" when the trial judge solicited "but did not receive a bribe from the petitioner." 973 S.W.2d at 206. While our supreme court broadly stated in Benson that "[a] trial is either fair or not" and that "[e]vidence of judicial corruption requires reversal regardless of the other facts of the particular case," those generalities are in conflict with the case law cited in the opinion and the court's ultimate holding that "[t]he denial of [a] petitioner's right to an impartial judge is a constitutional error which affects the integrity of the judicial process" with "[a] new trial [being] the only remedy." Id. at 207 (emphasis added).

More instructive is the United States Supreme Court's opinion in Bracy, which our supreme court relied on for its holding in Benson. In Bracy, the trial judge "was shown to be thoroughly steeped in corruption" by accepting bribes from criminal defendants to "fix" their cases. 520 U.S. at 901, 909. The petitioner in Bracy was not solicited for a bribe but argued that the trial judge's corruption caused him to have a "compensatory, camouflaging bias" against the petitioner. Id. at 905. Key to the Supreme Court's holding was the fact that the petitioner pointed "not only to [the trial judge's] conviction for bribe taking in other cases, but also to additional evidence . . . that [lent] support to his claim that [the trial judge] was actually biased in the petitioner's own case." Id. at 909. Furthermore, the Supreme Court's holding was limited in that the petitioner had

established "good cause" for discovery in his federal habeas corpus action. Id. The Bracy opinion acknowledged that it was possible the petitioner could have been "unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case." Id.

The Petitioner argues that Judge Baumgartner had "a motivation" to be biased in favor of the State "in order to prevent suspicion or investigation into . . . [his] misconduct" and that this "appearance of bias [was] a structural constitutional defect." However, as appalling as Judge Baumgartner's out-of-court misconduct was, the mere appearance of bias is not sufficient to establish a structural constitutional error. As stated in Bracy, the Due Process Clause requires a trial judge with "no actual bias against the defendant." 520 U.S. at 905 (emphasis added). Furthermore, the petitioner in Bracy did not just rely on the trial judge's out-of-court misconduct but presented specific evidence as to how that misconduct affected his particular case. Id. at 909; see also In re Hunt, 658 A.2d 919, 921-23 (Vt. 1995) (holding that there was no structural error when an appellate judge's misconduct in rejecting a plea agreement and change of venue in an interlocutory appeal was "wholly unrelated to [the] petitioner's trial").

Here, the Petitioner did not present evidence of Judge Baumgartner's out-of-court misconduct causing him to be biased specifically against the Petitioner. Lead counsel and co-counsel both testified about a change in Judge Baumgartner's demeanor and their perception that Judge Baumgartner's behavior was directed at the defense bar in general. However, there was nothing in the trial court record or this court's opinion on direct appeal that would demonstrate a specific bias against the Petitioner in this case. Put another way, no evidence showed that Judge Baumgartner's out-of-court misconduct pierced the veil of judicial impartiality in the Petitioner's trial proceedings.

The Petitioner also argues that Judge Baumgartner's presiding over his trial court proceedings constituted a structural constitutional error because Judge Baumgartner was impaired during the proceedings due to his addiction to pain killers. There is a surprising dearth of case law regarding whether the impairment of a trial judge would constitute a structural constitutional error. The cases dealing with a trial judge's misconduct and structural constitutional error focus on the misconduct's effect on the trial judge's impartiality. See, e.g., Bracy, 520 U.S. at 905-09; Benson, 973 S.W.2d at 205-06. The Petitioner relies on Summerlin v. Stewart, to support his argument that a trial judge's admitted drug use and subsequent criminal conviction alone would constitute a structural constitutional error. 267 F.3d 926, 950-56 (9th Cir. 2001), opinion withdrawn on reh'g en banc, 341 F.3d 1082 (9th Cir. 2003), rev'd and remanded on other grounds, Schriro v. Summerlin, 542 U.S. 348 (2004).

We do not find Summerlin to be persuasive. First, we believe that it is clear from the applicable case law that a trial judge's out-of-court misconduct must directly affect

-24-

the trial proceedings at issue to constitute a structural constitutional error. Second, the opinion was withdrawn by the United States Ninth Circuit Court of Appeals and ordered not to "be cited as precedent by or to [the Ninth Circuit] or any district court of the Ninth Circuit." Summerlin v. Stewart, 281 F.3d 836, 837 (9th Cir. 2002). Finally, the cases relied upon in the Summerlin opinion involved the competency of jurors rather than jurists. 267 F.3d at 948-49 (citing Tanner v. United States, 483 U.S. 107 (1987); Jordan v. Massachusetts, 225 U.S. 167 (1912)). Incidents of juror bias and misconduct have generally been found not to constitute structural constitutional error. See United States v. Tejeda, 481 F.3d 44, 50 (1st Cir. 2007) (rejecting a defendant's argument that claims of juror bias should be treated as structural constitutional error like claims of judicial bias); see also 7 Wayne R. LaFave et al., Criminal Procedure § 27.6(d) (4th ed. Supp. 2016).

In his brief, the Petitioner also cites to an order granting post-conviction relief by a different post-conviction court in a separate case involving Judge Baumgartner. See Final J. Order at 35, Raynella Leath v. State, No. 104426 (Tenn. Knox County Crim. Ct. May 12, 2016). However, the trial for the petitioner in Raynella Leath v. State occurred several months after the Petitioner's trial. Id. at 2 (noting that Ms. Leath's trial occurred in January 2010). Furthermore, unlike this case, there was testimony at the Raynella Leath v. State post-conviction hearing from a former courtroom officer that Judge Baumgartner appeared asleep during the trial and that she would slam the courtroom door to awaken him. Id. at 26-28. Accordingly, we do not find the post-conviction court's order in Raynella Leath v. State to be persuasive to our decision in this case because the testimony at the Petitioner's post-conviction hearing was much less compelling than what was presented at the Raynella Leath v. State hearing.

In the end, the question of whether Judge Baumgartner was intoxicated during the Petitioner's trial court proceedings is one of the credibility of the witnesses. The Petitioner testified that he saw Judge Baumgartner asleep on several occasions but told no one. Mr. Davis testified that he saw Judge Baumgartner with his head slumped down, but he was unsure if Judge Baumgartner was asleep. Lead and co-counsel both testified that they saw nothing during the Petitioner's trial that would lead them to believe Judge Baumgartner was asleep or intoxicated. However, both lead and co-counsel were concerned that Judge Baumgartner was confused and not paying attention during the last motion for new trial hearing.

The post-conviction court accredited the testimony of lead and co-counsel over the Petitioner's testimony regarding Judge Baumgartner's appearance during the trial. Conversely, the post-conviction court disagreed with lead and co-counsel's assessment of Judge Baumgartner's performance during the motion for new trial hearings. The post-conviction court found after its review of the trial record that "[o]nce having his memory refreshed, [Judge Baumgartner] demonstrated recall of the previous hearings and a

complete understanding of the issues" at the motion for new trial hearings and that the trial record overall showed Judge Baumgartner "to be coherent, engaged, and thoughtful." The post-conviction court concluded that the evidence did not show that Judge Baumgartner was impaired during the trial or in denying the Petitioner's motion for new trial.

Factual issues are to be resolved by the post-conviction court as are questions concerning the credibility of witnesses and the weight and value to be given to their testimony. Fields, 40 S.W.3d at 456. We are constrained in our review of these issues and bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Id. Following our review of the record and regardless of our abhorrence at Judge Baumgartner's illegal, out-of-court misconduct, we conclude that the evidence in the record does not preponderate against the post-conviction court's factual findings regarding whether Judge Baumgartner was intoxication during the Petitioner's trial proceedings. Accordingly, we affirm the post-conviction court's denial of post-conviction relief with respect to the Petitioner's claim of structural constitutional error.

### III. Thirteenth Juror

The Petitioner contends that Judge Baumgartner failed to perform his role as the thirteenth juror. The Petitioner argues that the post-conviction court erred in denying his petition with respect to this issue because it "improperly attribut[ed] the trial court's views on the sufficiency of the evidence to its thirteenth juror ruling on the weight of the evidence." The Petitioner further argues that Judge Baumgartner could not make a "proper thirteenth juror ruling" due to the passage of time and his status as "a drug addict." The State responds that Judge Baumgartner approved the jury's verdict by denying the Petitioner's motion for new trial.

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This is the modern equivalent of the thirteenth juror rule and "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (internal quotation marks omitted) (quoting State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)).

We "may presume that the trial court approved the verdict as the thirteenth juror" when it has overruled a motion for new trial without comment. Biggs, 218 S.W.3d at 653 (citing Carter, 896 S.W.2d at 122). It is only when "the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or

the jury's verdict, or [evidence] indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, [that] an appellate court may reverse the trial court's judgment" on the basis that the trial court failed to carry out its duties as the thirteenth juror. Carter, 896 S.W.2d at 122.

Here, the post-conviction court concluded that Judge Baumgartner had performed his duty as the thirteenth juror by stating at the motion for new trial hearing that "there was sufficient evidence to support [a second degree murder conviction] by the jury beyond a reasonable doubt." The Petitioner is correct that the role of the thirteenth juror is to judge the weight of the evidence rather than the sufficiency of the evidence and that Judge Baumgartner's statement was not evidence of his approval of the jury's verdict as the thirteenth juror.

However, there was no evidence in the trial record that Judge Baumgartner ever expressed dissatisfaction or disagreement with the weight of the evidence or that he had absolved himself of his responsibility to act as the thirteenth juror. Instead, Judge Baumgartner denied the Petitioner's motion for new trial in a written order that stated "[t]he verdict of the jury [was] specifically approved by the [c]ourt." Accordingly, we conclude that this was sufficient to establish that Judge Baumgartner approved the verdict as the thirteenth juror.

With respect to the Petitioner's argument that Judge Baumgartner could not perform his duty as the thirteenth juror due to the passage of time, we note that this court has previously held that Judge Baumgartner had fulfilled his duty as the thirteenth juror when he entered a similarly worded order in a different case on the same day he entered the order denying the Petitioner's motion for new trial. See Leath, 461 S.W.3d at 115.

Furthermore, while our supreme court has recognized that "[t]he more time that passes between the trial and the trial court's evaluation of the evidence as the thirteenth juror, the less meaningful the 'safeguard' becomes," that statement addressed the performance of the thirteenth juror duty on remand "after the case [had] work[ed] its way through the appellate courts." State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). We do not believe that statement was meant to imply that a trial judge could not approve of the weight of the evidence by denying a motion for new trial when, like in this case, the denial was delayed by the complex nature of the case and the motion for new trial. Accordingly, we conclude that this issue is without merit.[5]

---

[5] With respect to the Petitioner's argument that Judge Baumgartner could not properly fulfill his duty as the thirteenth juror because he was "a drug addict," we addressed Judge Baumgartner's competency to perform his duties as the presiding trial judge in the previous section.

-27-

## IV. Ineffective Assistance of Trial Counsel

The Petitioner contends that he received ineffective assistance from his trial counsel. The Petitioner's ineffective assistance of counsel claims center around two issues: (1) lead counsel's failure to inspect the Petitioner's car in a timely manner and to request Ferguson remedies other than the dismissal of the indictment; and (2) lead counsel's handling of the testimony of Dr. Mileusnic-Polchan, including his handling of Dr. Mileusnic-Polchan's accusation that one of his questions was a "lie."

The Petitioner argues that he was prejudiced by lead counsel's failure to timely inspect his car because "potentially exculpatory evidence was eroded" by the State's storing the car outside and lead counsel "was left unable to effectively refute the [S]tate's evidence." The Petitioner further argues that he was prejudiced by lead counsel's failure to request Ferguson remedies other than the dismissal of the indictment. The State responds that there was no Ferguson violation with respect to the Petitioner's car; therefore, the Petitioner was not prejudiced by lead counsel's handling of the issue at trial.

The Petitioner also argues that lead counsel was ineffective for failing "to attach [a] report from the defense's expert or an affidavit" to his motion for a McDaniel hearing and that this failure prejudiced the Petitioner because it prevented "a pretrial evidentiary hearing on the full scope of the [S]tate's forensic pathology testimony." The Petitioner further argues that lead counsel failed to object and properly cross-examine Dr. Mileusnic-Polchan because he was "unprepared and ill[-]equipped to process the information coming at him from the witness stand in the middle of trial." Finally, the Petitioner argues that lead counsel "improperly put his personal credibility at issue . . . by choosing to impeach" Dr. Mileusnic-Polchan "with her pretrial statement to [lead] counsel" and that he compounded the error by not putting on a witness to impeach Dr. Mileusnic-Polchan's testimony about the pretrial meeting.[6] The State responds that lead counsel was effective in his preparation for Dr. Mileusnic-Polchan's testimony and his cross-examination of her.

### A. Standard of review

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden

---

[6] Lead counsel's failure to object to Dr. Mileusnic-Polchan's statement, failure to request a mistrial, and failure to address this issue on direct appeal are not raised as claims of ineffective assistance of counsel in the Petitioner's appellate brief.

is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In reviewing a trial counsel's conduct, we make every effort to "'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting Strickland, 466 U.S. at 689).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." Felts, 354 S.W.3d at 277 (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)). Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

### B. Inspection of the Petitioner's vehicle and Ferguson motion

The Petitioner did not establish that he was prejudiced by lead counsel's failure to timely inspect the Petitioner's car or request multiple Ferguson remedies. As noted in this court's opinion on direct appeal, there was no exculpatory evidence to be preserved on the Petitioner's car. See Cornwell, 2012 WL 5304149, at *14-16 (holding that "[t]he location of the dirt rub [on the front of the car] was inculpatory, not exculpatory" and that the Petitioner "obtained 'comparable' evidence through photographic preservation of the evidence"). More importantly, Mr. Parham, the Petitioner's expert accident reconstructionist, contradicted the testimony of the State's experts about the dirt rub by testifying at trial that he did not believe that "the photograph of the front license plate . . . [was] conclusive of dirt rub." Id. at *12. Moreover, despite the fact that the car had been stored outside, Mr. Parham was still able to opine "that the physical evidence was consistent with [the Petitioner's] explanation of the incident" and to disagree with the opinions of the State's experts that the car was traveling in a "unilateral" direction. Id. at *12. Accordingly, we conclude that the post-conviction court did not err in denying the Petitioner post-conviction relief with respect to this issue.

## C. Dr. Mileusnic-Polchan's Testimony

At the outset, we conclude that lead counsel was not deficient in his preparation for Dr. Mileusnic-Polchan's trial testimony. Lead counsel hired a consulting expert, Dr. Pedigo, to review the autopsy report. Lead counsel then had a meeting with Dr. Mileusnic-Polchan to review her autopsy report. Co-counsel, Dr. Pedigo, and a member of lead counsel's staff, Mr. Davis, also attended the meeting. As a result of the meeting, lead counsel requested a continuance in order to retain an expert in forensic pathology, Dr. Davis, because he had learned that Dr. Mileusnic-Polchan would opine that all of the victim's injuries were "unidirectional" and that her testimony would be consistent with the State's theory of the case.

Much of the Petitioner's complaints about lead counsel's preparation for Dr. Mileusnic-Polchan's trial testimony are based on lead counsel's handling of his request for a McDaniel hearing. Lead counsel admitted at the post-conviction hearing that he did not request the McDaniel hearing to challenge Dr. Mileusnic-Polchan's qualifications as an expert in forensic pathology. Rather, lead counsel requested a McDaniel hearing as a discovery device to learn what Dr. Mileusnic-Polchan's trial testimony would be and "whether there [was] science to support [her] opinion[s]." Lead counsel explained that he needed to use the McDaniel hearing as a discovery device because Dr. Mileusnic-Polchan was "very careful" when interviewed "not to volunteer anything." Lead counsel also testified that he was aware that Dr. Mileusnic-Polchan had classified the victim's death as a homicide and of her opinion that the victim's injuries were "unidirectional."

While "[t]rial courts act as gatekeepers when it comes to the admissibility of expert testimony," that role "is not unconstrained." State v. Scott, 275 S.W.3d 395, 402, 404 (Tenn. 2009). Our supreme court has explained the constraints on a trial court's gatekeeping role as follows:

> When making an admissibility determination, trial courts are not empowered to choose between legitimate competing expert theories by excluding the lesser of the two. To the contrary, that task must be left to the trier of fact. The party proffering expert testimony need not establish that the expert testimony is correct, only that the expert testimony "rests upon 'good grounds.'" Where such a foundation exists, even if the trial court is of the view that there are better grounds for an alternative conclusion, the proffered expert testimony "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."

Id. at 404 (internal citations and footnotes omitted).

With that in mind, we conclude that the Petitioner failed to establish that he was prejudiced by lead counsel's handling of the McDaniel hearing request. Lead counsel did not attach a "countervailing expert opinion" to his motion. However, the trial court eventually granted his motion for a McDaniel hearing at which both Dr. Mileusnic-Polchan and Dr. Davis testified. While pretrial McDaniel hearings are preferable, it is not erroneous for a trial court to conduct a McDaniel hearing during a trial. See Scott, 275 S.W.3d at 404 (noting that the abuse of discretion standard of review for a trial court's admission or exclusion of expert testimony "applies regardless of whether the ruling was made during [pretrial] proceedings or during the trial itself"). Contrary to lead counsel's recollection at the post-conviction hearing, he had time after the McDaniel hearing to prepare for Dr. Mileusnic-Polchan's trial testimony and consult with Dr. Davis.

More importantly, this court held on direct appeal that Dr. Mileusnic-Polchan's testimony about the direction the Petitioner's car was traveling when it struck the victim, and specifically her testimony about the injuries left by the car's heat shield, was not "outside her area of expertise." Cornwell, 2012 WL 5304149, at *18. Rather, her testimony was "a proper subject upon which a medical examiner may offer testimony" because it dealt with "the interaction between the automobile and the victim's body." Id. This court also held that there was "no error in [Dr. Mileusnic-Polchan's] opinion that the manner of death was homicide." Id. Furthermore, Dr. Davis testified at trial about his major areas of disagreement with Dr. Mileusnic-Polchan's opinions. As such, the Petitioner was not prejudiced by lead counsel's handling of the McDaniel hearing because a foundation existed for Dr. Mileusnic-Polchan's testimony, and it was thoroughly tested by the adversarial process.

With respect to Dr. Mileusnic-Polchan's testimony to the jury, we note that "the method by which a witness is examined is a 'strategic and tactical decision of trial counsel which is not to be measured by hindsight.'" William A. Osborne v. State, No. M2014-00458-CCA-R3-PC, 2015 WL 832288, at *10 (Tenn. Crim. App. Feb. 26, 2015) (quoting State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991)). "[C]ounsel must make quick and difficult decisions respecting strategy and tactics which appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill[-]considered." Hellard v. State, 629 S.W.2d 4, 9-10 (Tenn. 1982). While lead counsel's "decisions throughout [Dr. Mileusnic-Polchan's] testimony may have been ill-advised," we cannot say that "a failed witness examination strategy . . . rises to the level of incompetent representation." Osborne, 2015 WL 832288, at *10.

With respect to his objections, lead counsel testified at the post-conviction hearing that he was hesitant to object during Dr. Mileusnic-Polchan's testimony because she testified "immediately" after the McDaniel hearing and because he did not have the

-31-

opportunity to process what he heard at the hearing or consult with Dr. Davis about it. However, as we noted above, the trial record belies lead counsel's recollection of Dr. Mileusnic-Polchan's testimony. Rather than, as the Petitioner argues on appeal, lead counsel being "unprepared and ill[-]equipped to process" what he learned at the McDaniel hearing, the record established that lead counsel was aware of Dr. Mileusnic-Polchan's opinions regarding the manner of death and direction of travel of the Petitioner's car, that he had extensively prepared for Dr. Mileusnic-Polchan's testimony, and that he had the benefit of a McDaniel hearing the day before Dr. Mileusnic-Polchan testified to the jury.

With respect to lead counsel's attempt to impeach Dr. Mileusnic-Polchan with her statements from their pretrial meeting, co-counsel testified that the defense team "agonized over how to use [that] information" and was aware that they "might suffer" by questioning Dr. Mileusnic-Polchan about the pretrial meeting. However, both lead and co-counsel believed that Dr. Mileusnic-Polchan's statements about the heat shield at their pretrial meeting confirmed the Petitioner's version of events. As such, lead counsel told the jury in his opening statement about the pretrial meeting, about what Dr. Mileusnic-Polchan had said regarding the heat shield, about co-counsel's confronting Dr. Mileusnic-Polchan with the orientation of the slats on the heat shield, and about Dr. Mileusnic-Polchan's leaving the meeting saying that she was unsure about the orientation of the slats and that she would have to check the car to confirm the orientation.

The Petitioner contends that by raising the pretrial meeting, lead counsel improperly put his credibility at issue. However, the case cited by the Petitioner to support this argument, State v. Zimmerman, dealt with a claim of ineffective assistance of counsel when trial counsel promised to present evidence during his opening statement but failed to do so during the course of the trial. 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). That is not the case here. Lead counsel confronted Dr. Mileusnic-Polchan about her statements at the pretrial meeting during his cross-examination, and Dr. Mileusnic-Polchan admitted that at the time of the pretrial meeting she was unsure of the orientation of the slats and that she needed to physically inspect the car to be sure.

In hindsight, it is clear that this attempt to impeach Dr. Mileusnic-Polchan was ill-advised given that lead counsel mistakenly stated that Dr. Mileusnic-Polchan said the car backed over the victim and Dr. Mileusnic-Polchan's strong reaction to that. However, we cannot say that adopting this strategy was deficient because lead and co-counsel believed that Dr. Mileusnic-Polchan had confirmed the Petitioner's version of the incident and had weighed the possible benefits of impeaching Dr. Mileusnic-Polchan with a prior statement that confirmed the Petitioner's story against the possible risks.

With respect to lead counsel's failure to call any witnesses to impeach Dr. Mileusnic-Polchan's testimony about the pretrial meeting, we note that lead counsel had

-32-

strategic reasons for not calling each of the possible witnesses. Lead counsel felt that he could not call Dr. Pedigo due to Dr. Pedigo's prior criminal convictions. Lead counsel felt that it would not be "fair" to call Mr. Davis because Mr. Davis was a relatively new employee at lead counsel's office. Lead counsel seriously considered calling co-counsel to testify and met with the prosecutor and Judge Baumgartner to discuss the ethical concerns of doing so. However, after considering the issue and Judge Baumgartner's advice, lead counsel decided not to call co-counsel as a witness for fear of how the jury would react and of making "a bad situation worse." Given that lead counsel had strategic reasons for not calling each of the potential witnesses, we conclude that his performance was not deficient in this regard. Accordingly, we affirm the post-conviction court's findings that lead counsel was not deficient in his handling of Dr. Mileusnic-Polchan's trial testimony.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE